Good morning again and welcome. Judge Johnstone, Judge Simon, and I are so pleased that you're here at the Ninth Circuit. Thank you very much for coming. Judge Johnstone and I would especially like to thank Judge Simon, who is from the District of Oregon. He has a very busy docket of his own, but he's taken on all this extra responsibility for additional cases to help us out here at the Circuit today, tomorrow, and Friday, and we're really, really grateful, and it is a real joy to work with Judge Simon. Thank you. Thank you, Judge Koch. Okay. We have submitted on the briefs and the record at least four cases already, and I'd just like to place that on the record. Plant Parenthood Federation of America v. Center for Medical Progress, Diaz-Zacarias v. Garland, Savaroff v. Garland, and Pearson v. the State of California have all been submitted. So, we only have one matter for argument today, and I would ask the appellant to come forward and let us know how much time you would like for rebuttal. Although, Judge Koch, so as not to confuse them, we do have another case being argued at 10 o'clock, but without you. That's correct. I put that on a different calendar, so there'll be a different presiding judge for that 10 o'clock calendar. So, for our students, we'd like to welcome students from the University of San Francisco Law School today. Thank you for coming. Please don't leave after this calendar, because there will be another one at 10, so you'll be able to watch one more argument before we'll have Q&A with clerks and with judges. Okay? So, thank you for coming as well. All right. Let's then call the case that's on argument for the 9 a.m. calendar, and that's CoStar Group v. Commercial Real Estate Exchange, Inc. May it please the Court? I'd like to reserve four minutes for rebuttal, if I may. All right. Go ahead, please. Thank you. My name is Nick Goldberg, Kecker Van Neston Peters. I represent the appellant, Commercial Real Estate Exchange, Inc., which I'll refer to as CREXI. You see that in the briefing as well, and I also represent CREXI in the district court. I'd like to focus my comments today on three significant errors by the district court that warrant reversal in this case. First, the district court improperly found that CoStar's anti-competitive conduct was a lawful and legitimate refusal to deal with a rival, even though we, CREXI, are not bringing a refusal-to-deal claim. Secondly, what this case is about, what our antitrust counterclaims are about, is CoStar's efforts to block brokers from working with CREXI. That is not a refusal-to-deal. Second, the district court misapplied, just fundamentally misapplied, bedrock Rule 12b6 precedent when it failed to accept CREXI's allegations as true, failed to draw inferences in CREXI's favor, and instead accepted CoStar's disputed version of the facts and applied those in its order. And third, I'll briefly touch on CREXI's allegations of monopoly power. CoStar is a monopolist. We've alleged that CoStar is a monopolist, and under this court's precedence, monopoly power is a quintessential fact question. So beginning with the refusal-to-deal, Your Honors, we made very clear in our amended counterclaims that CREXI is not bringing a refusal-to-deal claim. We're not seeking to force CoStar to do business with us. So what claim do you bring? You say, is it an exclusive-dealing claim? Is that a Section 1, Section 2? How does it matter? It's a claim that is based on CoStar blocking brokers from working with CREXI. It's recognized in Lorraine Journal. It's recognized by this court's decision in Advanced Health Care. It's recognized by the Tenth Circuit's decision in Chase. And is that a Section 1 or Section 2 claim? It's both. It's been recognized under both. In the Section 1 context, ZF Meritor, DenseFly, all recognize it in the contract under Section 1. In Section 2, Lorraine Journal recognizes it. It serves as a predicate for anti-competitive conduct under both provisions of the term. So let's take the Section 1. In what way is the user agreement, which I think would have to be the agreement covered under Section 1 here, exclusive? The claim here, Your Honor, is that the provisions of the contract lock brokers into de facto exclusive contracts. The practical effect of them is to prevent brokers from working with competitors. That works in several ways. When brokers list with LoopNet, which is CoStar's listing platform, CoStar requires them to enter into contracts that say, once you, the broker, upload the listing to LoopNet, that listing then becomes proprietary to LoopNet. That's just wrong. The listing does not belong to CoStar. But I guess, so there's a lot of discussion. I want to get to the bottom of this listing allegation. There's a lot of discussion on both sides on whose listings are. It is the broker's listing. The broker has the listing information independently, don't they? Why can't the broker then provide, the broker doesn't lose ownership of the listing information. They had it uploaded to the first place. So what's the exclusion there? Two points, Your Honor. I don't think there's any legitimate dispute, certainly CoStar doesn't argue it, that they cannot claim legitimate ownership over broker listings. But that's what they attempt to do in their contracts. And that's how brokers understand them. But, okay, so I, because this is, we have to take the allegations as true and draw the inferences in your client's favor, but I just can't understand right now in the current posture of the suit exactly what's going on with these listings. So a broker uploads, you know, Browning Courthouse for sale. Here's the details. Here's some photos. They have that information. That is their information. They upload it to CoStar's site. Or send it to them. Or send it to them. Right, you can email or other things. Okay. Broker still has possession and ownership and use of all of the listing information about the building. It's the use part. CoStar claims in their contracts, and this is exactly consistent with how brokers understand them. We've alleged example after example after example of this. Brokers understand the contracts, and the contracts can and are read, as we laid out in the complaint, to say that once you upload the listing to CoStar, to LoopNet, that information becomes proprietary. Okay. And so that information, even on the broker's own computer from their sent mail box, your understanding, this is going to be a question I'm going to have for your friends. Your understanding is that the contracts deem that ownership in the broker's possession as no longer usable by the broker by virtue of the fact that it has been also delivered and listed on CoStar. It's two steps. They claim, CoStar claims, that it becomes proprietary to CoStar. And that it is. It being what? The listings. The listings that is on, that is in the possession of the broker, or the listing that's on now within the widget? Brokers understand it to mean both. And then CoStar says, the listings cannot be shared with competitors. And so we've alleged example after example in the complaint where we try, CREXI tries to work with brokers, and the brokers tell us, we can't work with you. It conflicts with our agreement with CoStar. Now, your Honor is putting, I think, your finger on an important issue where the district court got this wrong. Fundamentally, this is a fact question. This is an evidentiary issue. CoStar wants to say that as a practical matter, we're wrong. It doesn't operate in the real world to prevent brokers from doing business with us. I guess it may be a fact issue, but it's which facts you're asking us to find state of claim. And this might have led the district court to think that this is a refusal to deal. If what you're saying is that there is a duty for CoStar to provide listings that it now has taken into its website and processed and added value to with respect to its consumers to then provide to those, that's one kind of claim. And maybe it's a Lorain Journal claim. I'll note we haven't applied Lorain Journal since Trinco. So that's something in our minds. That's one sort of claim. If instead, and maybe that states a claim or not, but that's a different claim than if you view the user agreements discussion of connection and properly allege that they are trying to reach into the broker's possession of their own listing and prevent the broker from uploading that to a competitor. That would be a different and perhaps a stronger claim. Very fair distinction. It's 100% the latter. We are not seeking, and we made this clear in paragraph 12 of our counterclaims. We are not seeking access to LoopNet to go take listings directly from LoopNet. What we want, what this claim is about, is trying to unravel the technological blocks, the contractual terms, the threats that prevent us. I guess one question that I think Judge Johnstone is getting at is you have a declaration from one broker who says, look, I have 300 listings, they're changing daily, I just don't have the ability to then upload that same information on a competitor's site. So it's kind of a barrier to entry, I guess you could say, right? They're kind of dependent on CoStar, it's the dominant player in the market, so they have to list there, and they just don't have the ability to list elsewhere. So I guess the question is, that then still is the broker's information. They could do it, they just might not have the time, the staff to actually list it. That is not what we allege. Okay, clarify that, please. It is certainly not consistent with the market reality, Your Honor. Okay. So you're referring to, I believe, Broker 3 in our amended counterclaims, which relates to a loop-link blockage. That's where the broker, this applies, we allege, to more than 1,000 brokerages across the United States. The brokerage has a website, they upload the listings to their own website, it has a plug-in to loop-link that CoStar offers. That website becomes the record that the broker uses to track his or her listings. Now the broker says to CREXE, we want to list with you. Please go to our own website, look at the listing, and put it on CREXE. And then unbeknownst to the broker, CREXE has been blocked from accessing that listing by CoStar. But I guess that seems to, you're alleging, I guess, that that falls into the second category, that that's information within the broker's position, but that's information that CoStar has because the broker is using CoStar to host that information. To think of a, if I have all of my phone contacts on an Android phone, and I go to Apple and say, I want you to get all those contacts out of there, does, is there, I mean, right, that starts to look like a duty to deal. Why can't Apple go to Android and pull all of my information from one phone to the other? Is that an obligation the antitrust laws impose? I don't think it's that fact pattern, Your Honor. I think it's much closer to the Microsoft fact pattern, or the advanced healthcare fact pattern, or the Chase manufacturing fact pattern, where a monopolist has integrated an anti-competitive trap into a third-party platform. That's what happened in Microsoft when it linked Internet Explorer to the Microsoft operating system, sent it out to browsers, DC Circuit, and by the way, after an, I think, 87-day trial. Can you just clarify, let's hear your different theories, because I have found this not that clear. So you're saying the first one is that if someone lists on CoStar, CoStar says that is now our, your listing of your property you're trying to sell is now our proprietary information. We do not allow you now to use that with any competitor, because that's our property now, effectively. So that's one theory. Your second theory is this other one of Broker 3. Do you have others? And the technological barriers, is that just in support of your exclusive dealing, de facto exclusive dealing claim, or are you alleging that's a separate, independent, anti-competitive feature or conduct? We have four different anti-competitive conduct theories, all of which must be, under this court's presence, must be considered together, but they fundamentally have one objective, let's make that clear, which is to block brokers. Well, can you list the four? Sure. And I'm sorry to ask it. Absolutely. No, no, no. It's a totally fair question. Yeah. The first is the loop-link blocks, which we've talked about. The second... That's Broker 3. And others, we've alleged several others. That's a technological barrier. That's a...  Correct. And then you have the contract. We have the de facto exclusive contracts backed up by litigation threats, which have been carried out, as we allege. We have a theory that is based on CoStar falsely claiming intellectual property ownership over brokers' own listings and own photographs. That's where they add their little logo to the bottom of brokers' photos. They say that that photo, that logo, is indicative of their ownership of the photo. They do the same by seeding false data in listings and then saying, if that listing appears on any other website, you're now in prima facie breach of contract. They demand...  And then you have the trademark claim is the fourth. Correct. Exactly. So the photo one is, I guess, although it may present some slightly different doctrinal issues, is kind of a good example of this. So a broker uploads photos, you know, again, just as I might upload my photos up to Facebook or something. And it's really helpful because it helps me keep track of it. It's a lot easier than going through my folder structure or looking through my phone and stuff. I've got all my favorite photos on this platform. And that platform decides to use technology to say that I can't just export those photos. I can upload my own photos, the exact same photos, to a competitor. But I can't ask the application or its widget to export the photos off of my website where I am using, in this case, CoStar's technology. I can't just ask them to export it to some other service. That's what the... With respect to photos, as well as with respect to... With the listings, right? That seems like a harder claim to establish. That looks like a refusal to deal with a competitor. Again, but not the fact pattern of this case, because that's not the claim. But how do they get the watermarks if they have the watermarks on them? Or if it is on their website within the widget, that is by definition information that the brokers provided to CoStar as part of their service. Two ways, Your Honor. What happens in the real world is that CoStar demands that... This happened to Crexie, that competitors use these filters to screen for images that CoStar claims, promised to us, represented to us that it only includes images it owns. We run the filter. We then screen out thousands of photographs that CoStar has now told us they claim they own because it includes this little logo. We then say to brokers, we have to now take down this listing because CoStar has told us that it owns this photograph. Exhibit A to the amended counterclaims includes example after example after example where brokers say, that's false. That's our image. And now, that has nothing to do with Crexie going on to LoopNet, going on to CoStar. That has to do with CoStar falsely claiming ownership over photos that then hit the Crexie platform and interfere with our ability to do business, prevent us... Sorry, go ahead. No, go ahead. Finish your sentence, please. Just, I was going to say, Your Honor, and prevent us from working with brokers and gaining the critical input that's necessary in this industry, which is the listings. So, if you're right, and I'm going to focus this question on section one. Yes, sir. If you're right and the brokers are misunderstanding the contract and if you are correct that CoStar does not in fact own that, where's the agreement that's necessary for a section one liability? The agreement is the contract between CoStar and the brokers. But if the brokers are misunderstanding the contract and CoStar really is not improperly asserting claims of proprietary interest in that, as the brokers mistakenly think, assume, then what specifically in the contract is an unreasonable restraint of trade? Sure, Your Honor. Let me just take you to the provisions. And by the way, I don't think that the brokers are misunderstanding the contract. So I just want to make that clear. And part of why I ask that is because now I'm worried if the case goes back to the district court, will the district court or the jury have to decide what the contract means? Will the trial court have to decide what the contract means? And then what would happen if it turns out that the brokers are misunderstanding the contract? It's a great question and I think it's a fact issue in the end. The jury would ultimately take a look at the contract, take a look at the way that CoStar has enforced it, take a look at the way that it works in the industry and brokers understand it and weigh that evidence and its practical effect, which is what Tampa Electric stands for. You don't just look at the terms, you look at the practical effect of the contract. And then depending on the results of that question, there either will or will not be an unreasonable agreement. And of course, you know, we allege that there's been tons of foreclosure of brokers, but those are ultimately fact issues. But just to turn to the contract, Your Honor, Exhibit F to the amended counterclaims is the loop net terms and conditions. That's at ER 196 through 217. Now there's a provision in there that says you agree. This is the you refers to the brokers. You agree to treat all information obtained from the service, including loop net materials, listings, member directory, and any information otherwise made available to you in the service. It goes on to define that as content as proprietary to loop net and then it restricts you from sharing it. Now, this is the critical part. How does COSTAR define the service? How does it define the service, ER 197? It defines the service to include, quote, the submission of information to loop net. It's saying the service that we claim ownership over is the broker's information that it provides to us. The same language or substantially the same language occurs in the COSTAR terms of service. It just defines its product, its content, to include information that it has obtained from brokers, claims ownership over it, and then restricts you from using it with competitors. That's anti-competitive. I see I'm— I actually have two questions for you. Can you address COSTAR's argument that the disjunctive language regarding reduced output in both Ohio versus American Express and Epic Games versus Apple doesn't apply in the sort of defining market monopoly power context, only applies to, you know, anti-competitive effects and rule of reason analysis? Can you address that, please? I don't think that that's correct. The discussion in those cases of anti-competitive effects, the whole purpose of anti-competitive effects is to show that there is harm in a defined market. So for example, if you look at the discussion of anti-competitive effects in the Epic Games case where this disjunctive language occurs, it all comes in an analysis of direct evidence of anti-competitive effects under Section 1. The court then goes on and it looks at monopoly power in Section 2 and says, it's the same analysis. It refers back to its prior discussion. Those are flip sides of the same coin, Your Honor. There is no case, at least they haven't cited any and I'm not aware of any, that holds that a plaintiff has to allege restricted output of the monopolist in order to prove direct evidence of monopoly power on a 12B6 motion. I'm just not aware of any such case. Relatedly, aren't Arita and Huffenkamp correct when they say that in order to maintain super competitive prices, you've got to restrict, as a practical matter, the ability of competitors to increase output? Exactly. So let me ask you another question, though. How is your evidence of market share in the listing market, evidence of market share in the information or auction market? You say they're complementary, but that's really not enough. How can we infer that that one evidence of that constitutes evidence of the other two markets? It's a fair question. We also allege that CoStar holds more than 90 percent market monopoly power in the information market on a nationwide basis. Now, Your Honor, there's just not data that is available to us that's public that would allow us to do the granular MSA by MSA calculation as we did in the listings market. We looked at that with our economists. They scoured the earth. There's just nothing that would permit that sort of calculation on a granular level. But as a pleading matter, it is a reasonable inference to say if you hold 90 percent or 95 percent, for example, in the auction market, that you hold a dominant share of the market in these individual MSAs. It's certainly enough that they know what they're defending against, and we can sort it out in expert discovery. All right. You've gone over your time, but I will give you some time for rebuttal. I would appreciate that. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Melissa Arbacheri here on behalf of CoStar. There was a lot covered during the first half of the argument. I want to hit on some of the questions. The first, Your Honor, was the question of, you know, really this is an either-or situation in terms of both the case law and the facts. So either what they are alleging is that CoStar has prohibited brokers from taking their very own listing information and giving it to competitors. The problem with that argument is it fails based on the factual allegations in the complaint itself. The other version of their argument is that what CoStar is actually prohibiting brokers from doing is taking the information directly from LoopNet, directly from LoopLink, and handing it over to competitors. But that theory runs right into the refusal to deal cases, as Your Honor recognized. So let me start with the— I guess I'm unclear. On the contractual provisions, it's pretty clear that they are alleging that the contracts forbid brokers from using their content available on LoopNet in connection with any other competitor's service, that they are, you know, defining brokers' listing as any information made available via LoopNet as proprietary to CoStar, forbidding brokers from providing this information to competitors. I think there are sufficient allegations here regarding the contractual provisions. So what do you think is missing? So I think you have to look at the contract itself, which is attached to the complaint. So it's fair game at the motion-to-dismiss stage. And when the attached contract conflicts with the way they characterize it, it's the terms of the contract that control. And so we could look at the LoopNet agreement that we were talking about earlier, and you look at page 199 of the excerpts of record, and it defines something called submitted content. And what the agreement says is, broker, the information you are giving to us is your information. You retain an ownership interest with respect to that information. We only have a non-exclusive license when it comes to that information. And by the way, you should keep backup copies of that information. Everything else they're pointing to is not the submitted content. It's a separate defined term, content, and it's only talking about information that is in the service or from the service. So I think the terms of the contract do control and they're attached, but let's talk about how brokers understand. Let's still talk about the terms of the contract. So with respect to content and use of information, I think the allegations are that there's some potentially broad language here that says, that doesn't sufficiently distinguish between the two. I mean, does your client disclaim any inference, like when you use terms like in connection with, the use of connection with, the use of the content, that you disclaim the theory that the brokers are concerned about, that if they take their own content that is actually submitted content, but use it elsewhere, that COSTAR has no interest in that, that it's not threatening litigation over it, not threatening enforcement of these terms? Absolutely. So I think there's two important distinctions. One is the one I started talking about, which is the broker's own information versus what's actually on LoopNet and taking it directly from there. But the other two ways of looking at it, so one version of these listings, and this is paragraph 143 of their complaint, is that when they submit to LoopNet, this is the broker's information, they've gotten it from publicly available sources, and they're just handing it over to LoopNet. That version, that is their information. Like you said, they retain a copy. You know, we're not in the days of Polaroids. It's not like you hand over your only copy of the photo. They have their own copy. They can supply it to competitors. The other version is when they go to list on LoopNet, instead of just taking publicly available information, they take information from COSTAR's database, from COSTAR's resources and researchers, and they populate the information on LoopNet with that COSTAR property. Now that's fundamentally distinct, but I don't think that's what they're arguing. They're saying this is all public information. And I think there's no better way to understand that this is not exclusive. I mean, I think that in terms of the contract— So what is the COSTAR information in your example you just gave? So, you know, one way you can do a listing is you want to list with COSTAR, you want to list with LoopNet, you go to type in, you know, the property that you're trying to list, and you have COSTAR has gone out and taken pictures of the property already and has all of this other information to populate the database. So I think that's, you know, a potential scenario. I don't think that's what they're alleging. They're alleging that this is all publicly available information. That's paragraph 143. And I would—my friend pointed the court to Exhibit A, and I think Exhibit A actually proves up our point that brokers are not confused about this. They don't misunderstand and think that once they list on LoopNet, they could no longer list with anybody else. Exhibit A is a list of dozens and dozens of brokers who say—and you could look at Broker 48. Well, let's look at Broker 2. She says she couldn't give CREXI permission to post her listings because from what I understand, that would be some sort of breach of contract with LoopNet. Right. And so— Broker 6, I'm foreclosed from working with CREXI because it would conflict with our national COSTAR agreement. Broker 5, when CREXI offered to match listings posted on brokers on website, Broker 5 says that arrangement would be problematic in regard to our contractual relationship with COSTAR LoopNet as well as any user of LoopNet. So clearly there's— No, where I think there is confusion, frankly, is whether or not they can take—you know, they want to list with CREXI purportedly, right? Whether they can go to Loop—say, hey, just go to LoopNet and grab our listing from there or just go to LoopLink and grab our listing from there. That's what's not allowed, but that's when we get to the refusal to deal cases. But when it comes to their own information, the possession, I mean, the contract says this is your information. You have ownership over it. We only have a non-exclusive license. And if you look at, for example, Broker 48, Broker 53, they're saying we list on both CREXI and LoopNet—I mean, CREXI and COSTAR. The whole concept between all of these broker complaints are brokers saying this is our property. We own this. Reinstate our listing on CREXI immediately because this is our information. The other way you know that there's no exclusivity is other allegations in their complaints. So look at paragraph 257, where they say— Can I just say, when I read this district court opinion, it just didn't read like a motion to dismiss, right? It read more like summary judgment because on a motion to dismiss, you have to give inferences in favor of the non-moving party. You have to accept the allegations in the complaint as true, but it just feels like there's constant factual fighting and disputing the allegations in the complaint, which to me just doesn't seem like proper on a motion to dismiss. Right. So every time you say, well, let's go to more evidence, let's go to more evidence, this is—that's a summary judgment argument. That's not a motion to dismiss argument. Your Honor, but I'm not going to evidence. I'm not going to anything outside of the complaint itself, and it is very common on a motion to dismiss to look at what's attached to the complaint and hear the contract itself. I mean, the meta decision out of the D.C. Circuit in 2023 is a good example of that. There, the states included certain excerpts from the terms and conditions, and the court said, yeah, we're not just going to look at the excerpts or your characterization of them. We're actually going to look at the document and the full agreement, and when we look at the full agreement, it just doesn't say what you say. It does. And so this isn't outside of a motion to dismiss. And the other allegations I'm pointing to, it's not like I'm pointing to evidence. But even your disputes on the market share, that all sounds like summary judgment. When I read through, oh, well, that's an overestimation. Let me give you more speculation about what that should be. You know, on a motion to dismiss, where inferences, reasonable inferences, have to be inferred in favor of the nonmoving party to say COSTAR has 90-plus percent market share, and then look at what is minimally required to show for market power or monopoly power as low as, what, 45 percent, 65 percent, to say, oh, there's an overestimation. And clearly, that overestimation would consume the entire delta between 90 percent, 95 percent, down to 50 percent, 65 percent. That's just drawing inferences in favor of COSTAR. Your Honor, I don't think it is. And it's just not a matter of percentages. It's a matter of markets. And so what's really clear is that at the motion to dismiss stage, you do actually have to allege relevant markets. And we point to cases from this Court, the Rickmick decision, the Medvax decision. These are motion to dismiss decisions that are affirmed on appeal because they fail to allege monopoly power in the relevant market. So in both of those cases, they had similar percentages, 90 percent, 95 percent. And what the Court said is, sure, you have those numbers. But when I look at your allegations, you're talking about the wrong market. You're talking about the retail market, not the wholesale market that you've alleged. And that's the problem with their monopoly power allegations. Let's just look at the listing services market, okay? Now these are just allegations in the complaint. Obviously, you know, discovery and whatnot could show otherwise. We're just looking at the complaint. They say COSTAR itself says that nearly 90 percent of all CRE activity, commercial real estate activity, occurs on a COSTAR network, okay? COSTAR's graph showing dominant share of website visitors in the network, internet CRE listing services market. COSTAR receives approximately 86 percent of website traffic. Let's look at the metropolitan statistical areas. Twelve of such areas, over 90 percent. Thirty-one of such areas, over 80 percent. Thirty-eight such areas, over 70 percent. Forty-six areas, over 60 percent. All 50 metropolitan statistical areas, over 57 percent. So, you know, I look at this complaint and, you know, it just doesn't seem like on a motion to dismiss, this isn't sufficient. Your Honor, we're not quibbling with the percentages. What we're quibbling with are the markets. And the markets are absolutely something you have to allege in your complaint. Because without alleging the relevant market and market share in the relevant market, all the rest of it is meaningless. You can't judge anti-competitive harm. You can't judge substantial foreclosure. But you are quibbling with the numbers. All your arguments are these are overestimations. No. No. They're the wrong markets. So, let me try to explain that. Because if that's not clear, that's really important. Our quibbling with the 90 percent and the website visitors is because that is, I guess, a national market, whereas the geographic markets they defined are the individual MSA. So, those are the wrong geographic market. When it comes to the individual MSA market and the numbers they have there, that's the wrong product market. They're comparing it to sales. Sales is not a market they've alleged. They've alleged nothing with respect to two of their markets. But there's a reasonable inference to say that property sales are a proxy for listings. I think that's a reasonable inference. And that is something that the district court rejected. So, I kind of go back to if this is a motion to dismiss, if I disagree with you that a motion to dismiss should not be accepted. I understand on jury judgment at a trial you may prevail. But this is MTD. So, let me explain why it's not a reasonable proxy even at the motion to dismiss stage. And it's because they've nowhere alleged that these are exclusive listings and they're not. So, perhaps if we were in a world where the listings were exclusive so they could only be listed on one site, then maybe there would still be other problems. But maybe at a motion to dismiss, that would be an okay proxy. But that's not the case. And CREXI says, you know, we didn't have more information. Well, CREXI could have run that exact calculus with their own numbers. And they didn't. And I think it's reasonable to infer that they didn't because we would end up way over 100%. This is the 500% point we make in our brief. Because if the same property is listed on both COSTAR's network and CREXI's network, you're going to start double counting. And triple counting. And you're going to end up way above 100%. Can I turn to the conduct allegations? So, first, with respect to the contract. So, we've got a couple, four different kind of alleged anti-competitive practices. Starting with the contract, what's your answer to Judge Simon's question about what do we do with the motion to dismiss if the brokers seem to be reading the contract to cover more information than you read. But there's plenty of allegations that there is. What are we supposed to do with that? So, two responses to that. And I think it does depend in part if we're talking about Section 1 or Section 2. And we haven't spoke about the de facto exclusive dealing cases, which come, I guess, under both sections. But for Section 1, you need an agreement. And if you look at the de facto exclusive listing case, or dealing cases, rather, that they talk about, they're not this. They fall into two categories. One category. And so, I want to talk about the brokers, too. I don't want to forget about them. But if they're reading of the contract, right? If the allegation is that the contract, and there's some dispute over it, is being read broadly, so that it is requiring the brokers to deal exclusively with CoSTAR with respect to their own listings, which is the allegation. Why isn't that enough to state an exclusive dealing claim? So, for two reasons. It does not fit within the case law that they're citing. Not one of those cases is that fact pattern. They talk about practical realities and market realities and what the brokers think. But in every one of those cases, there is an explicit, clear contract term. What if it's an ambiguous term that's susceptible to being read by your user base? So, I don't think there is an ambiguous term, but also, none of those cases are that. I mean, these are cases that say, if you want this rebate, you can't deal with our competitors. These are cases that say, if you want, you know, you have to buy 90% of your product from us. I mean, these are explicit terms and agreements, and the debate in those cases is maybe it's not a long-term agreement, it's just a policy or a program, or maybe it's just a discount and a rebate, and is that good enough? So, it doesn't fit within any of those cases. The other category of cases, and this is the Chase Manufacturing case, and it kind of gets into Lorraine Journal, I think, a little bit. But these are instances where there's not an agreement, and so you're kind of outside of Section 1 world, and I think you're outside of Section 1 world in this case. But they're not in agreement, but there is actually explicit threats, right? So, this is where, in Chase Manufacturing, there's an email that says, you can't work with our competitors. In Lorraine Journal, clear as day that the newspaper said, if you want to advertise with us, you can't advertise with the radio station. So, that's where I think you get to the broker allegations. That's not in the contracts in Lorraine Journal. I mean, that was alleged, you know, extra-contractual behavior, right? Well, but that was under Section 2. I mean, and it's under Section 1, you need an agreement. So, I think, you know, a unilateral threat just doesn't qualify as a Section 1 claim. Well, let's bring in Section 2 and the allegation of threats. Right, and so if you look at the allegations of threats, they fall into three categories. Number one, it literally just says threats. There's no factual allegation behind it. Number two, what it's talking about is the prima facie breach language that's in the agreement, and what that prima facie breach language says is if we adjust, modify your listing, and we find that adjusted or modified listing on a different website, we know you will have taken it directly from LoopNet, and that's a violation of our term. That's a prima facie breach. Then the third category are the ones that we were talking about in Exhibit A, where CREXI sent a letter to these customers and said, COSTAR is claiming copyright ownership of your stuff. This isn't anything COSTAR sent. This is CREXI sending the letter, framing the letter, and telling its customers that COSTAR is claiming ownership over your property, and I think what you see if you look at what the brokers say in Exhibit A is they understand the right. They're very upset about getting these letters. They're saying, this is our property. These are our photos. We want you to reinstate it immediately, and so I don't think these examples — I also don't want to lose sight of the substantial foreclosure point, because even if you have a handful of brokers who are confused or misunderstand what the contract says, number one, that's not a de facto exclusive dealing claim, but number two, you still need to show substantial, and you need to allege substantial foreclosure in the relevant market, and all they have in the complaint in its paragraphs 136 to 139 is just repeating the words, substantial foreclosure. What is missing is a denominator. They don't allege how many brokers are in the market. They don't allege how many listings are in the market, but what is alleged? Look at paragraph 123 of the complaint. This is a screenshot from one of the CREXI advertisements. So this is CREXI's own ad, and it says, we have over 500,000 listings. In our complaint, in the underlying case, it's in the district court, and this is paragraphs 52 and 138. It's in the supplemental excerpts of record. CREXI is out in the market saying, we have all of the listings on our website. We have far more than our competitors, and I think this turns back a little. Okay. In your remaining time, let's turn now to the technical barriers. So there have been some cases. We have one, I believe, involving LinkedIn under the California Act, but I believe applying Section 2 doctrine that suggests that using technical barriers to prevent a competitor from accessing otherwise publicly available information, which I think is what's alleged here, is that customers, the public, can go there and get that information, but CoStar blocks CREXI. Why is that not enough, assuming monopoly power, to state a Section 2 claim? So a couple points on that. They've dropped that part of their allegation, so their initial counterclaims were based on that and on LoopNet and the publicly available information, and this morning, over and over again, we're no longer alleging that. We're not focused on LoopNet. We're not saying we get to get information from LoopNet. We're only focused on the contract and on LoopLink, and I think, as your Honor recognized, LoopLink is essentially the equivalent of LoopNet in this respect. It's still a CoStar product. It is a LoopLink- But they still allege, so what are the technical barriers? I'll ask this to your friend on rebuttal, but they allege technical barriers beyond the contract. So the technical barriers they allege are specific to LoopLink, and LoopLink is a CoStar product the same as LoopNet, so while they say they've abandoned the LoopNet allegations, their LoopLink barrier allegations are really one in the same, and I think that is what gets you back to the refusal-to-deal cases. The other point I'd make on the HiQ case that I think you were referring to, I mean, number one, they don't cite it anywhere in their brief, and I think it's because they've abandoned that theory of the case. Number two, the district court decision in HiQ that was dismissed had an antitrust claim, and it dismissed it, and so what was issued in this court on appeal was a tortious interference claim, which the district court didn't allow them to bring for procedural reasons in addition to the merits, so I think it's distinct in that respect. But the third point I would make, the idea- I mean, really, I think their technological barrier argument sounds a bit in the essential facilities doctrine, the idea that this is a critical input and we need to be able to get access to it from loop link, or they say not loop net, but it's one and the same. But the problem with that is, number one, they disavow over and over again that this is a refusal-to-deal case and they're not trying to invoke it. But number two, their own allegations say, and this is paragraph 40 of their complaint in note five, there's only about 1,000 brokers that use loop link. You're not required to use loop link. They don't elect it's free. So how would you distinguish, I think HiQ was the case I had in mind, how would you distinguish from Microsoft? I think Microsoft is fundamentally different. So the allegations in Microsoft and proved up in Microsoft was that there was this inextricable technological shackles and link that if you tried to upload a competing browser, it basically was going to kill the operability of your system because they linked the browser with the operating system. There's no such link here. I mean, in some ways, it sounds like they're trying to say that you need to have loop link to get access to your information. But again, only about 1,000 brokers per their own allegations have loop link. They're saying we're not saying we get access to loop net. And so I think the more on point cases for this are the meta case out of the D.C. Circuit in 2023. I think you can look at then Judge Gorsuch's opinion in the Novell case out of the 10th Circuit. I think this court's decision in the MySpace case, it's unpublished but it's cited in footnote five of our brief. Those are the refusal to deal cases that not only say you're not required to share your property with your competitors, but actually it's an anti-competitive to have forced sharing because it discourages innovation. It discourages investment. I see my time is very up. I actually have two questions for you. But did you finish answering Judge Johnstone's question? I did. And if you would indulge me, if I could end with one point against the thread. That's completely fine. Two questions. I understand on the de facto exclusive dealing issue that you raised that there's a letter or there's an agreement in the Third Circuit case and 11th Circuit case that may not be present here. But aside from that, would you agree that there's no circuit decision that actually rejects a de facto exclusive dealing theory? Because even the cases that were filed by the antitrust officials and academics, those cases don't actually reject the theory. They just say on the facts of those cases de facto exclusive dealing wasn't established. I agree with that if we're talking about the same thing when we say de facto exclusive dealing. And I think that's part of the confusion because there's a lack of clarity of what that means. I think the de facto exclusive dealing cases, like I said, are sort of one of two categories. But I agree none have rejected those versions.   this Court's decision in Aerotech, which actually I think is also another one to look at for sharing concept, but we're not going to decide it here today. We don't have to because this looks nothing like the de facto exclusive dealing cases. And in Aerotech there were virtually no factual allegations that supported that theory. So I think there's a lot of confusion along those lines. Yeah, I mean the Court was very clear in that case that there were like five million holes that never got plugged with regard to the factual allegations. Let me ask you one more question. One of the issues is whose restricted output is relevant. And you seem to be saying it's just co-stars. But if I look at Ohio versus American Express, if I look at Brook Group, they say no, with super competitive prices there's a relationship. So when there's a super competitive price that is sustained over a long period of time, there's necessarily going to be reduced output in the market. And Ohio versus American Express says and it's, you know, because it's already happened, it's impossible to actually prove up the reduced output. But you would agree that the entire market's reduced output is relevant, not just co-stars. I think it's relevant and I think it comes into a play in the direct evidence context. And this is going to be a long answer if you don't mind, because I think there's, you know, there's a real lack of clarity, I would say, in the case law as to whether you need to show both super competitive pricing and restricted output when it comes to proving up direct evidence of monopoly power. I think the foresight decision from this court is a holding on this issue. It's on point and I do think it's binding. And I don't think American Express or the later cases detract from it. So American Express and Epic. But what if I disagree with you on that? Rebel Oil is 29 years old. So not Rebel Oil. Foresight is 27 years old, right? It's 1997. It is. And if I read Ohio versus American Express, that's 2018. You got Epic Games versus Apple, that's what, 2023? So in my view, it feels like the law is, that's no longer a good law on that one point. So I think on that one point, those cases, when they have the disjunctive phrasing, it's in the context of anti-competitive effects. But when they're actually talking about market power, both of those cases, when they're talking about market power, they use the phrasing super competitive pricing by restricting output. That's in American Express, and it's also in Epic Games. And in fact, the district court decision in Epic Games found sufficient proof of anti-competitive effects, but said market share, market power was a problem because there was no reduced output allegations. And I think really what this gets at is it is really rare, and the case law says it's really rare to be able to have direct evidence of monopoly power. Now, if someone's able to keep super competitive prices and to also restrict their own output at the same time and do that for a sustained period of time, then yeah, that shows you're a monopolist. That's sort of the point. Are there other ways to exercise monopoly power? Of course there are. But when you're talking about direct evidence, it's rare to be able to prove it up that way, which is why it's more limited in that respect. The final point I want to make on that, because I do think, again, the case law is a little bit tricky even if it was an either-or situation. The allegations of super competitive pricing are exceedingly weak, and they're actually internally contradictory. And I don't think this is in our brief, so if I could just point out to the court, if you look at the two most specific pricing allegations they have, and it's paragraph 215 and 217, I'd also point the court to paragraph 197. They say in 215, and this is back in 2012, so well outside of the statute of limitations, one customer said, my prices went up 300 to 500 percent, so from about $200 to I think it's about $1,100. And then they say in paragraph 217, several years later after the bankruptcy, they raised it another 80 percent. If you look at paragraph 197, which is also talking about the 80 percent, how did they raise it purportedly another 80 percent? Well, they raised it from $255 to $466. And so there's just a real disconnect with these numbers and a contradiction with them, which I think just gets back to my markets matter point. You can't just throw... I guess I don't understand the contradiction between 197 says that after CoStar drew Excelligent out of business through the litigation, driving them to bankruptcy, that there was an 80 percent price increase after. So if you look at... And then I look at 217, it says the FTC's efforts to protect Excelligent as a viable competitor, CoStar attacked Excelligent, drove it into bankruptcy, raised the price 80 percent. So I guess I'm not quite clear on that. So I think those two are referring to the same thing, and 217 refers to it as another 80 percent, I believe. And so I think the implication was it was raised in 2012, you know, 300 to 500 percent, and then it was raised another 80 percent. But the actual dollar figures don't make any sense. So in 215, it says it was raised to like $1,100, whatever the this is. And then in... No, I think they're different. I thought the loop net acquisition was 2012, and the Excelligent bankruptcy was 2017. So is that just referring to two different time periods? Maybe they're saying the... Well, maybe if it is, then it shows the prices went back down again. I'm sorry, just give me one second. You know, I think maybe there is no contradiction here if the 300 to 500 percent is the loop net merger in 2012, right? That's where it went from $200 a month to $11,032 a month. And then they're saying separate issue. Let's go to 2017. That's when it went up, you know, another 80 percent because Excelligent, the viable competitor to CoStar, was, they allege, driven out of business. So I guess I don't see the contradiction there. I guess one of a couple things is going on there either. The price went up in 2012 to $1,000, you know, $1,100, and then, you know, went back down, I guess, to $250. Or there's a contradiction. It's one of the two things, but I think it just goes to the larger point, which is that they have cited no case where pricing allegations of that sort are sufficient to allege direct evidence, and I think it just goes to the larger problem of really needing to show monopoly power within a relevant market, and to, you know, pleading allegations like that are hardly what would be enough to support their arguments in that respect. And if I could just end with 54B, because I know we didn't talk about that at all today, you know, we did file a motion to dismiss saying that this court doesn't have jurisdiction because the district court was wrong to say that this is a partial final judgment under 54B. We do re-raise that in our brief. It is a jurisdictional question, and I was a little surprised at argument here today to hear my friend talk about the watermarking allegations that are in the complaint. They dropped those in their appellate briefing. They don't make any argument based on them, and we say in our response in a footnote, they seem to have dropped them. It seems like they probably did so because that's a key part of the overlap between what's going on in the district court and what's before the court today, and so I was really surprised to hear them raise the watermarking allegations again, and I think it just goes to the overlap and makes the 54B issue that much more prominent and that's something, despite having abandoned it in their brief, that they're pushing. All right. Any further questions, Dr. Simon? No? Okay. Thank you very much. Thank you. That was very helpful. All right. Three minutes. Go ahead, please. Thank you, Your Honors. Just a few points I'd like to raise in response. Almost all of what we just heard were arguments about the evidence, arguments about inferences one could draw from the complaint, arguments that brokers haven't, in fact, been foreclosed. The contracts don't actually say what we allege they say or don't operate in the real world in the way we allege that they operate. Those are not, just fundamentally, those are not 12B6 arguments. They're just not. And I understand, I mean, I get that they want to make those arguments. I get that they want to present their evidence. They will have their shot. That's what discovery is for. But is there a conflict between paragraphs 197 and 217? No, no. Why not? We're talking now about the price increases. In 2012, after the LoopNet merger, customers complained about a 300% to 500% price increase. Now, they say, well, the prices must have gone back down. Another inference, and in fact, probably the correct one, is that they charge different prices to different customers. So it's totally plausible that one customer in 2012 experienced a 300% to 500% price increase. Perhaps it was more. That's what we've alleged based on the public information we've located. Later, after they drive Accelogen out of the market, they raise prices 80% again. It doesn't mean that the prices went down. It doesn't mean that there's a conflict. It could mean that there are different prices charged to different customers. It's not a conflict. It's also just evidence. I mean, it's just evidence. It's 12B6. They say, oh, some broke. Crexie has customers. Crexie has listings. Some brokers have found ways to work with Crexie. So it hasn't been completely foreclosed. That's just not the law. That's not the law. Microsoft talks about barring competitors from cost-efficient means of competing. The 11th Circuit in McWane talks about raising rivals' costs. The entire body of law. I was surprised to hear an argument about substantial foreclosure. We've alleged paragraphs about substantial foreclosure. We've alleged more than 70 examples in the complaint. It is not the law that on a 12B6 motion, anything more is required. Look at the Fourth Circuit's decision in DuPont. Have you dropped your watermarking allegations? That was another surprising one. Absolutely not. I would refer your Honors to pages 18 through 20 of the opening brief where we lay out this watermarking. Why doesn't that overlap with the remaining original claims? It's a different theory, Your Honor. Now, I will confess that we do have a copyright misuse defense to the copyright claim, but that is not coextensive with antitrust law. The case law makes that clear. And regardless of how that defense fares or even whether it's taken up at trial, which we don't know whether it's a basis for decision, it's not going to change the issue before this Court, which is whether these claims are sufficiently pleaded. I don't really think 54B is an off-ramp. It's just going to be a road back here in two years. What are the technological barrier claims that you've dropped? We are not alleging that we need or have an antitrust right to access listings on the LoopNet website. They're right about that. We are not alleging that. Now, I agree with Your Honor that under HYCU, that very well could be a legitimate antitrust theory. I've read HYCU carefully. I think it could be. We're not pursuing it. So LoopLink is the widget? LoopLink takes it totally outside of that framework because now what you're talking about, as Your Honor noted, is something much more akin to Microsoft. Well, yeah, I guess it depends on whether we... I mean, the widget, presumably, it might begin to look like you're asking for access to APIs, for example, that the widget provides indistinguishably from website. It's fundamentally different. You know, they rely on Meta and Novell. Meta, for example, was an API agreement that said you app developers can't come on to Facebook and use it to take our core product, our core service. This is, we're going to integrate LoopLink into brokers' websites, booby-trap the websites so that unbeknownst to the brokers, we can block competitors from accessing the brokers' listings on their own websites. Mr. Goldberg, I guess at the end of the day, if at the end of this lawsuit you receive a remedy that simply allows, per CoStar's own interpretation of the contract, brokers to use submitted content however they wish but not to use content that has been uploaded, that a win? That's what this is about? That would go a long way, frankly, Your Honor. I mean, what we see in the marketplace and what we've alleged is just tremendous fear, uncertainty, doubt. They said litigation threats. We've just said the word threats. How about the Leon Capital example? Leon Capital works with Crexie. Leon Capital supports Crexie. What does CoStar do? They cut them off entirely. They say, you've breached your contract. You've now become a direct or indirect competitor of CoStar because you've worked with Crexie, and now we're going to sue you in federal court in Washington, D.C. That's not a threat. You risk getting sued by CoStar if you support Crexie. That's Lorraine Journal. That's Chase Manufacturing. It is not these refusal-to-deal cases. I understand I've already gone over my time. If I could just finish with one. Quickly, very quickly. This is a significant antitrust case, Your Honors. It's a significant antitrust case against an aggressive industry player in CoStar. Now, we believe strongly that CoStar is a monopolist. We believe strongly that they have violated the antitrust laws. The FTC is investigating that conduct, and it's been harmful to Crexie. It's been harmful to the industry. It has been bad for brokers. We believe we've sufficiently pleaded these claims, and we deserve an opportunity to prove them. We deserve an opportunity to try to hold CoStar accountable for what we believe is unlawful conduct, and we would respectfully request that this course reverse the dismissal and remand to the district court. Thank you for your time. Thank you to both counsel for very, very helpful arguments. We appreciate it. Thank you for taking over your time. Sorry for taking over your time. And this 9 o'clock calendar is adjourned.
judges: KOH, JOHNSTONE, Simon